IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR BERNARD TRILLO,<br><br>              Petitioner,<br><br>vs.<br><br>T. FELKER, Warden, Salinas Valley State Prison,<br><br>              Respondent. | No. 2:06-cv-01287-JKS<br><br>MEMORANDUM DECISION |

Victor Bernard Trillo, a state prisoner appearing *pro se*, filed a Petition for Habeas Corpus Relief Under 28 U.S.C. § 2254.  Trillo is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the California Correctional Training Facility.  Respondent has answered, and Trillo has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

Following a jury trial in January 2002, Trillo was convicted in the Sacramento County Superior Court of Murder in the Second Degree (Cal. Penal Code § 187(a)).  The jury found as true that Trillo had personally used and discharged a firearm causing great bodily injury (Cal. Penal Code §§ 12022.5(a)(1), 12022.53(d)).  The trial court sentenced Trillo to a prison term of 15 years to life on the second-degree murder conviction and a consecutive term of 25 years to life for the use of a firearm, for an aggregate sentence of 40 years to life.  Trillo timely appealed to the California Court of Appeal, Third Appellate District, which affirmed his conviction and

sentence in an unpublished, reasoned decision.[1]   The California Supreme Court denied review on March 2, 2005.

On January 23, 2006, Trillo filed a petition for habeas relief in the Sacramento County Superior Court.  After holding an evidentiary hearing, the Sacramento County Superior Court denied his petition on May 5, 2008, in an unpublished, reasoned decision.  On May 25, 2006, while his petition for habeas relief was pending before the Sacramento County Superior Court, Trillo filed a Petition for relief in this Court.  This Court stayed the petition pending exhaustion of Trillo's state-court remedies.  On June 20, 2008, Trillo filed a petition for habeas relief in the California Court of Appeal, Third Appellate District, which was summarily denied without opinion or citation to authority on July 24, 2008.  Trillo's subsequent petition for habeas relief in the California Supreme Court was summarily denied on January 21, 2009.  Trillo filed his Amended Petition in this Court on January 27, 2009.  Respondent moved for dismissal of the Amended Petition on the ground that Trillo had not exhausted his state court remedies as to one of his two prosecutorial misconduct claims.  This Court denied that motion.

As summarized by the California Court of Appeal, the facts underlying Trillo's conviction are:

> While the many witnesses gave differing versions of exactly what happened the night of the shooting, the general events surrounding the shooting were undisputed.  Margo Corona decided to have a party at her house to celebrate her birthday, as well as the birthdays of Joe Aguilar and another friend.  The party had a Hawaiian theme and 30 friends and coworkers were invited.  The party was held in the backyard; there was loud music and a lot of alcohol.
>
> After midnight the partygoers went to a bar, American Spirit.  When the bar closed, they returned to Margo's.  Several other people at the bar, including [Trillo] and his friends George Munoz and Jose Padilla, joined the after-party.

---

[1] *People v. Trillo*, 2004 WL 2943242 (Cal. App. Dec. 1, 2004).

Back at Margo's, Joe Aguilar and Jesse Laxton got into a fist fight on the front porch. Margo was very upset and told everyone to leave. As people left, there was confusion and yelling. Several men took their shirts off and began fighting.

[Trillo] was in the street firing a gun in the air and yelling, "get the fuck back." He lowered the gun and fired, hitting Margo's 19-year-old nephew, Aaron. [Trillo] got in a car and drove away. The next day he left for Oregon to visit his father. A few days later he went to visit relatives in South Carolina. He was arrested there in early September.

Police found six spent .40 caliber shell casings at the scene. The shells came from the same gun. A buck knife was found near the victim's blood. Small drops of blood on the knife matched Aaron's DNA. Two usable prints on the knife could not be matched to Aaron, [Trillo], or [Trillo's] friends. Statements were introduced from two emergency medical personnel that they did not see a knife when they arrived at the scene. A search of the getaway car, a maroon Honda, revealed paperwork in [Trillo's] name in the trunk as well as a .40 caliber clip. There was no blood in the Honda. The victim died from a gunshot wound to the head. The wound was of an indeterminate range, but not a contact range wound.

Several neighbors testified they heard gunshots and called the police. One testified that after the shooting she saw a man run after a purple Honda yelling for it to stop. When the car stopped, he got in, and the car took off. The man was limping. Several of the neighbors heard yelling; one testified it was not "a happy scene" and another said she felt it would get out of hand. One neighbor heard someone yell after the shooting, "you fool, it is your fault, you stupid, it is your fault."

Margo Corona testified she knew [Trillo] and his cousin George Munoz. She had met Munoz about a month and a half before the party at American Spirit. Munoz and [Trillo] came over twice, once for a barbecue and once to watch a movie. Munoz called her often, but she was not interested in him due to the 10-year age difference. She also thought they had nothing in common. Margo did not like Munoz's attitude; he flashed his tattoos and talked about where he was from a lot. She did not invite Munoz and his friends to the party; she did not want them there. She saw Munoz and [Trillo] at the bar the night of the party, but did not invite them back to her house. They came anyway and Munoz came in her kitchen and asked why she had not called. He asked if she was seeing someone. When she said yes, Munoz responded, "already" and "cool" and left. Margo did not ask Munoz to leave her house.

When Margo saw Joe Aguilar and Jesse Laxton arguing on the front porch, she told them to knock it off, but they started fighting. While they were fighting she saw something silver drop fall from Joe Aguilar's pocket and assumed it was a gun. She later told the detective that Joe dropped a gun and Roger Delgado picked it up. Margo did not want problems at her party and went in the backyard and told everyone to leave. There were guys in the street arguing; some had taken their shirts off and began fighting. She yelled at them to leave and told them she

3

would call the police. Her nephew Aaron told her not to worry, he would make them leave. As she ran to the house to get the phone, she heard gunshots.

Margo testified Aaron had a black folding knife he used for construction. It was similar to the knife found near his blood.

Catarino Aguilar was a key prosecution witness because he alone identified [Trillo] as the shooter. He was the roommate of Joe Aguilar, although not a relative. He noticed [Trillo] at American Spirit because when he went to the restroom [Trillo] approached his girlfriend. Catarino told [Trillo] the girl was with him and [Trillo] responded "gensa" which meant "excuse me." Catarino told the detective he was mad at [Trillo] for approaching his girlfriend and he was going to keep an eye on him because he "had it in for this motherfucker."

Later when Margo told everyone to leave because there was a fight in the front, Catarino grabbed two knives from the kitchen. He saw a group of men who had taken their shirts off; [Trillo] was part of that group. [Trillo's] group walked to a car and [Trillo] came back. [Trillo] was angry and hostile, firing the gun in the air. [Trillo] brought the gun down, pointed it ahead, turned the gun sideways and fired. The shot lifted the victim off his feet. The victim was five or six feet from [Trillo].

Catarino testified Aaron did not get back when [Trillo] fired the warning shots; Aaron was "just crossing the street" and Catarino did not see a knife in his hand. Catarino also told the detective that [Trillo] knew he had let off three rounds and "his life is in danger" because there are more people with guns, but Catarino did not see any other guns.

Dennis Filippi knew Margo from high school. He testified that after he heard there was a fight in the front he saw people taking off their shirts; some of them had tattoos. He told the detective this group was "more hardcore," gangster types with "a lot of tats." The group "ran up" on Robert Munoz and then on someone else. After the fight was broken up, it was hectic in front; people were motioning as if they had weapons. He told the detective it was kind of like a mob riot.

Roger Delgado also knew Margo from school. He saw the fight between Joe Aguilar and Jesse Laxton. He saw Joe's pager fall during the fight. After Margo yelled that the party was over there was a big crowd in the front yard. A few took their shirts off. Someone behind Delgado had a gun. Delgado put his hand on it and said, "we don't need that shit here." The gun was a semiautomatic.

Jose Padilla was a friend of [Trillo]. They were both from Madera. Padilla owned a purple Honda Accord and lived with Munoz and [Trillo]. Both he and [Trillo] were members of the gang VTW, Varrio Tiny Wino, in Madera. Under questioning by the prosecutor Padilla denied he knew any gang rules regarding respect. He claimed the rules regarding retaliation depended on the individual. "I just live my own."

The night of the shooting he owned three guns, including a .40 caliber Ruger semiautomatic. The next morning his guns were gone.

4

Padilla testified that after Margo told everyone to leave, someone said something that offended him and he took his shirt off.  The person's friend said he was drunk, so Padilla said okay and turned away.  He left his shirt in the yard.  Padilla, Munoz and [Trillo] got in the car; [Trillo] was driving.  The car stopped and they got out.  He did not know why they stopped.  People were fighting and someone hit him.  He fought with someone until he heard gunshots.  He turned and saw the car leaving; Tina was driving and he got in.  [Trillo] and Munoz were in the backseat.  At trial, for the first time, Padilla said [Trillo] complained his back hurt.

Tina Lopes-Arteaga was a friend of [Trillo].  She had gone to American Spirit that night with Maryann Bedford and afterwards went to Margo's.  She claimed she saw 20 or 30 people coming towards [Trillo] and Munoz as they were leaving Margo's.  She also claimed she saw a large Hispanic man at the party with a gun in his belt.

Bedford also testified she saw 25 to 30 people confront [Trillo], Munoz and Padilla, although she had not mentioned this to the detective.  She testified she saw two older Hispanic men loading a weapon.

Jesse Laxton testified he did not see anyone with a weapon that night.

Gabriel Contreraz was a friend of the Corona family and went to Margo's party.  He was in the backyard after they came back from the bar and heard someone say his cousin, Robert Munoz, was in a fight.  He went out front and saw a guy fire shots in the air and then point the gun down the street and let off a few rounds.  He was drunk when he spoke with the detective that night.  He told the detective he saw Aaron approach [Trillo] after the shots in the air.  Contreraz described the scene to the detective as like the "heat of battle" and said [Trillo] must have thought Aaron was running up on him.

[Trillo] was 19 years old at the time of the shooting; Munoz was 21 and Padilla was 23.  [Trillo] explained he grew into being a Norteno and was not jumped into a gang.  His gang was called the Varrio Tiny Winos after older guys who were the Varrio Town Winos.  If a gang member was disrespected it all came down to the situation as to how one reacted.  Some might react violently and others would not.  [Trillo] had a juvenile record for attempted burglary, giving a false name and a drug warrant.

On August 5, 2000, [Trillo] and his friends were planning to go to Hot August Nights in Reno.  The trip was delayed because a friend was still fixing his car.  Instead, they went to American Spirit where they heard about the party at Margo's.  When they got to Margo's, [Trillo] was putting CD's in the trunk when he saw Padilla's gun.  He put it in his waistband because at other after-parties he had seen such things and he wanted to fit in.  At other parties people showed tattoos and guns and he was "stereotyping Margo's friends."

After Margo told everyone to leave, [Trillo] walked through the front door and saw a guy with a gun.  [Trillo] pulled up his shirt, showed his gun, and made eye contact with Delgado.  Delgado said there was no need "for that shit" and

[Trillo] turned away.  [Trillo] saw Padilla arguing with someone; Padilla had his shirt off.

[Trillo] and his friends got in the car and [Trillo] heard Padilla say, "fuck you" to people as they began to drive away.  People were yelling at the car.  It moved forward a few feet and then the back door flew open and Padilla jumped out. Munoz also got out of the car.  Padilla was fighting and Munoz was on the ground.  [Trillo] got out and people came towards him.  He pulled out the gun and fired into the air, saying "get the fuck back."  [Trillo] was hit in the back; he turned but saw no one.  Then he saw someone approaching and he saw what looked like a knife.  He fired twice and ran back to the car.  The man with the knife was within five feet of [Trillo] when he fired.  [Trillo] testified he thought he would be stabbed if he did not shoot.  [Trillo] admitted there had been nothing to prevent the car from leaving before.

[Trillo] went to his friend Jaime Almuina that night.  There was blood on [Trillo's] back and Almuina bandaged the wound.  Almuina testified the wound was one-half inch and swollen.  When [Trillo] was arrested one month later he had a minor cut on his back.  A pathologist for the People testified that from a picture of the wound it appeared only a day or two old.  A defense pathologist testified it was possible the injury was one month old.  No human material was found on the knife that was found at the scene.

A professor of criminal justice testified the drops of blood on the knife were consistent with back spatter from a medium to high velocity force.  Back spatter travels only a few feet.  The blood on the knife most likely was spatter from the victim.  It was possible there was no blood on the handle because someone was holding the knife.

Another professor of criminal justice testified for the defense as a gang expert.  He explained there were great differences in gangs; some were extremely violent and in others kids just walked up to join.  Fourteen to thirty percent of adolescents were involved in gangs.  The general purpose of a gang is loyalty, camaraderie, and something to belong to.  The automatic response to disrespect varies on the circumstances.  If a lot of friends are watching one may be prompted to act; that is not just gang behavior but teenage behavior.  Being there for your friends is a virtual requirement in a gang, but it is not uniform.

The final witness was [Trillo's] friend and cousin George Munoz, also from Madera.  He testified that when they were leaving Margo's, Padilla reacted to a "disrespective comment."  As they were leaving guys were yelling at them because they were not from around there.  Someone called them a bunch of punks. Padilla jumped out of the car.  Munoz got out "to address the issue" and was hit. Padilla was also "getting jumped."  The hitting stopped shortly after the shots were fired.  The car was leaving and Munoz whistled; it stopped and he got in. [Trillo] was curled up in pain.[2]

---

[2] *Trillo*, 2004 WL 2943242, at *1-*5.

## II.  GROUNDS RAISED/DEFENSES

In his Amended Petition Trillo raises six grounds:  (1):  prejudicial admission of evidence of gang membership; (2) exclusion of exculpatory evidence; (3) prosecutorial misconduct in closing argument; (4) juror bias/misconduct; (5) ineffective assistance of trial counsel in failing to pursue the issue of juror bias/misconduct; and (6) ineffective assistance of trial counsel in failing to object to prosecutorial misconduct.  In his answer, Respondent has not asserted any affirmative defense.[3]

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[4]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[5]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[6]  Thus, where holdings of the Supreme Court

---

[3] *See* Rules—Section 2254 Cases, Rule 5(b).

[4] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[5] *Williams*, 529 U.S. at 412.

[6] *Early v. Packer*, 537 U.S. 3, 10 (2002).

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[7]  When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be objectively unreasonable, not just incorrect or erroneous.[8]  The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that the state court determination was incorrect.[9]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[10]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state-court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[11]  Because state court judgments of

---

[7] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations by the Court); *see Wright v. Van Patten*, 552 U.S. 120, 127 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[8] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[9] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[10] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[11] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[12]

In applying this standard, this Court reviews the last reasoned decision by the state court.[13]  State appellate court decisions that affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[14]  Under California's unique habeas procedure, a defendant who is denied habeas relief in the superior court files a new original petition for relief in the court of appeal.  If denied relief by the court of appeal, the defendant has the option of either filing an original petition for habeas relief or a petition for review of the court of appeal's denial in the California Supreme Court.[15]  This is considered as the functional equivalent of the appeal process.[16]  Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[17]  This presumption applies to state trial courts and appellate courts alike.[18]

When there is no reasoned state court decision denying an issue presented to the state court and raised in a federal habeas petition, this Court must assume that the state court decided all the issues presented to it and perform an independent review of the record to ascertain

---

[12] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[13] *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004).

[14] *Ylst*, 501 U.S. at 802-03.

[15] *See Carey v. Saffold*, 536 U.S. 214, 221-22 (2002).

[16] *Id.* at 222.

[17] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[18] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

whether the state court decision was objectively unreasonable.[19]  The scope of this review is for

clear error of the state court ruling on the petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state
> court's decision, we can view it through the "objectively reasonable" lens ground
> by *Williams* . . . .  Federal habeas review is not *de novo* when the state court does
> not supply reasoning for its decision, but an independent review of the record is
> required to determine whether the state court clearly erred in its application of
> controlling federal law.  Only by that examination may we determine whether the
> state court's decision was objectively reasonable.[20]

"[A]lthough we independently review the record, we still defer to the state court's ultimate

decision."[21]

## IV.  DISCUSSION

Ground 1:  *Admission of Evidence of Gang Membership*

Over the objection of the defense, the trial court allowed inquiry into whether Padilla,

Munoz, and Trillo were members of the same gang.  Trillo contends that the admission of the

evidence of gang membership was prejudicial error.  The California Court of Appeal, agreeing

that the admission of the gang membership was error, determined that it was not prejudicial.

> [Trillo] contends the error violated his due process right to a fair trial and
> the proper test of prejudice is whether it was harmless beyond a reasonable doubt
> under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].  We disagree.
> Evidentiary error may violate due process when there are no reasonable inferences

---

[19] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam).

[20] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (internal citation omitted); *see also Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004).

[21] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).  This Court notes, however, that the question of the deference to be given summary denials was left open by the Ninth Circuit, sitting en banc.  *See Pinholster v. Ayers,* 590 F.3d 651, 663 (9th Cir. 2009) (en banc); *Richter v. Hickman*, 578 F.3d 944, 951 n.5 (9th Cir. 2009) (en banc).  The issue is presently pending before the Supreme Court *sub nom, Harrington v. Richter*, No. 09-587.

a jury may draw from the evidence.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1246.)  Here, the gang evidence was marginally relevant as to bias, motive and intent so there was no due process violation.  Rather, we analyze whether the error was harmless under the familiar test of *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Cardenas, supra,* 31 Cal.3d 897, 907; *People v. Maestas, supra,* 20 Cal.App.4th 1482, 1498.)  We will find a miscarriage of justice only when we are of the opinion from an examination of the entire cause that it is reasonably probable the jury would have reached a result more favorable to defendant absent the error.  (*People v. Watson, supra,* 46 Cal.2d 818, 836.)

Our review of the record leads to the conclusion that the admission of gang evidence was harmless error.  First, while any gang evidence is potentially inflammatory, here the evidence was limited to gang membership and did not include the more inflammatory evidence of gang criminal activity.  This limitation distinguishes this case from *People v. Bojorquez* (2002) 104 Cal.App.4th 335, 343-345, in which the court found evidence of gang membership was admissible to show witness bias but the admission of evidence of criminal activities of gangs, and specifically criminal activity attributed to defendant's gang, was prejudicial error because it tended to imply criminal disposition or actual culpability.  Here, the defense was able to negate some of the prejudicial effect of the gang evidence by offering expert testimony that not all gangs were violent.

Second, the court gave a proper limiting instruction.  "Evidence of gang membership was admitted for a limited purpose.  This evidence, if believed, may not be considered by you to prove the defendant is a person of bad character or that he has a disposition to commit crimes, and may be considered by you as evidence of motive and/or intent but only if you find that he acted in accordance with a gang-related motive of purpose.  [¶]  Evidence of common gang membership may also be considered if it shows a bias on the part of any witness with regard to his or her testimony."  Absent contrary indications, we presume the jury followed the court's instructions.  (*People v. Pinholster* (1992) 1 Cal.4th 865, 919.)[22]

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."[23]  "The introduction of unfairly prejudicial evidence against a defendant in a criminal trial . . . does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental

---

[22] *Trillo*, 2004 WL 2943242 at *6-*7.

[23] *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

conceptions of justice."[24]   In a federal habeas proceeding, the standard for assessing the prejudicial impact of constitutional error in a state-court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[25]   "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."[26]   In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in Federal Constitution."[27]   For example, the Supreme Court has barred the introduction of evidence in state-court criminal proceedings that violated the Fourth Amendment (search and seizure),[28] Fifth Amendment (confessions),[29] and the Sixth Amendment (Confrontation Clause)[30] and (right to counsel).[31]   The introduction of gang membership does not fall within the scope of any of these proscriptions.   On the other hand, in deciding cases involving the Federal Rules of Evidence or federal evidentiary statutes, the Supreme Court is acting in its supervisory capacity over the

---

[24] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998).

[25] *Fry*, 551 U.S. at 121.

[26] *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)).

[27] *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

[28] *Mapp v. Ohio*, 367 U.S. 643 (1961).

[29] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[30] *Crawford v. Washington*, 541 U.S. 36 (2004); *Pointer v. Texas*, 380 U.S. 400 (1965) (transcript of preliminary hearing without assistance of counsel to confront and cross-examine absent witness inadmissible).

[31] *Burgett*, 389 U.S. at 114-15 (evidence of prior conviction obtained in violation of Sixth Amendment right to counsel inadmissible).

lower federal courts.[32]  "'Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'"[33]

The trial court also gave a limiting instruction about the purpose of the gang membership testimony, specifically that it could be used solely as evidence of motive and/or intent but only if the jury found that Trillo acted in accordance with a gang-related motive of purpose, or to show a bias on the part of any witness with regard to his or her testimony.  As did the California Court of Appeal, this Court assumes that the jury followed the limiting instructions it was given.[34]

Based upon the record before it this Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[35]  Nor can this Court find that the state court unreasonably applied the correct legal principle to the facts of Trillo's case within the scope of *Andrade-Williams-Schriro*; *i.e.*, the state court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable.[36]  Trillo is not entitled to relief under his first ground.

Ground 2:  *Exclusion of Exculpatory Evidence*

After the shooting, an unidentified man was seen approaching the victim on the ground and ask, "Was it Worth it?  The speaker was described as being desperate and upset.  The

---

[32] *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006).

[33] *Id.* (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)).

[34] *Abney v. United States*, 431 U.S. 651, 664 (1977).

[35] 28 U.S.C. § 2254(d).

[36] *See Alberni*, 458 F.3d at 866-67.

defense offered this statement as a spontaneous statement.  The defense also argued that the statement corroborated the defense theory of self-defense.  The trial court ruled against its admission.  Trillo contends that the exclusion of this testimony encroached upon his constitutional right to present a defense.  The California Court of Appeal on direct review rejected Trillo's arguments, holding:

> [California] Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."
>
> A spontaneous statement under Evidence Code section 1240 is one made without deliberation or reflection; the theory of trustworthiness is that spontaneous statements made under the stress of excitement while reflective faculties are stilled may be an uninhibited expression of the speaker's actual impressions and belief.  (*People v. Farmer* (1989) 47 Cal.3d 888, 903, overruled on another point in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)  "The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is thus not the nature of the statement but the mental state of the speaker."  (*People v. Farmer, supra,* at p. 903.)
>
> Whether the requirements of a spontaneous statement are met are questions of fact to be resolved by the trial court.  (*People v. Poggi* (1988) 45 Cal.3d 306, 318.)  We review the trial court's ultimate decision whether to admit the statement for an abuse of discretion.  (*People v. Phillips* (2000) 22 Cal.4th 226, 236.)
>
> Here, the statement was made spontaneously while the speaker was under the stress of excitement; the neighbor described the speaker as desperate and upset.  Even if the speaker did not see the shooting, his comment was prompted by Aaron's felled body.  A closer question is whether the statement "purports to narrate, describe, or explain an act, condition, or event perceived by the declarant."  (Evid.Code, § 1240, subd. (a).)  [Trillo] contends this requirement is met because the statement relates to the perceived event. (*Showalter v. Western Pacific R.R. Co.* (1940) 16 Cal.2d 460, 468.)  He contends it described Aaron approaching [Trillo] after [Trillo] fired warning shots.  The trial court was not so certain of the statement's meaning and neither are we.  It could simply refer to Aaron's undertaking to get everyone to leave the party or even having the party at all.  Given the ambiguity of the statement, the trial court did not abuse its discretion in excluding it.

14

[Trillo] contends exclusion of the statement undermined his constitutional right to present a defense.  "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense."  (*People v. Hall* (1986) 41 Cal.3d 826, 834.)  Moreover, this evidence was not crucial to the defense, so any error in excluding it was harmless.  Both Catarino Aguilar and Gabriel Contreraz testified Aaron was approaching [Trillo] when he was shot.  The more critical question was whether Aaron had a knife in his hand and was threatening [Trillo]; this statement did not speak to that issue at all.[37]

It is well-settled law that a criminal defendant has a constitutional right to present a defense.[38]  This right is not, however, unfettered or without limitation.  "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."[39]  This latitude, however, has limits.  "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"[40]  This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"[41]  The Constitution clearly "prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair

---

[37] *Trillo*, 2004 WL 2943242 at *8-*9.

[38] *Crane*, 476 U.S. at 690.

[39] *United States v. Scheffer,* 523 U.S. 303, 308 (1998); *see also Crane,* 476 U.S. at 689-690; *Marshall v. Lonberger,* 459 U.S. 422, 438, n. 6, (1983); *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973); *Spencer v. Texas,* 385 U.S. 554, 564 (1967).

[40] *Crane*, 476 U.S. at 690 (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984); citations omitted).

[41] *Scheffer,* 523 U.S. at 308 (quoting *Rock v. Arkansas,* 483 U.S. 44, 58, 56 (1987)).

prejudice, confusion of the issues, or potential to mislead the jury."[42]   The Supreme Court has repetitively held that the Constitution permits judges "to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'"[43]

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code § 352, permits the exclusion of evidence if its probative value is "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."[44]  California employs a similar rule.[45]

Based upon the record before it, this Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

---

[42] *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) (citing Fed. R. Evid. 403 as an example).

[43] *Crane,* 476 U.S. at 689-690 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)) (ellipsis and brackets in original); *see Montana v. Egelhoff,* 518 U.S. 37, 42 (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

[44] *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and County of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).

[45] *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("[w]e review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

proceeding."[46]   Nor can this Court find that the state court unreasonably applied the correct legal

principle to the facts of Trillo's case within the scope of *Andrade-Williams-Schriro*; *i.e.*, the state

court decision was more than incorrect or erroneous, its application of clearly established law

was objectively unreasonable.[47]   Trillo is not entitled to relief under his second ground.

Ground 3:   *Prosecutorial Misconduct*

Trillo contends that the prosecutor committed misconduct by arguing that Trillo and his

friends fabricated the self-defense theory after-the-fact.   The California Court of Appeal

described the factual basis for Trillo's prosecutorial misconduct allegation as follows:

> In closing argument the prosecutor commented on the differing stories
> Tina Lopes-Arteaga told, including that [Trillo] was not the shooter.   But once
> Catarino Aguilar identifies [Trillo] as the shooter, down to the rings on his
> fingers, the prosecutor claimed, "Suddenly we have the self-defense snap defense
> coming up."   [Trillo] did not object to this argument; counsel explained later he
> did not want to draw attention to it.
>
> The prosecutor continued to argue about changing defense stories in his
> rebuttal argument.   He ridiculed Maryann Bedford's story about a 300-pound man
> shooting a gun and argued [Trillo] was not smart enough to think it through when
> he started making up stories.   "First story was a lame one, first story was I wasn't
> the shooter.   All my friends are going to say they didn't see me with a gun."
> [Trillo] objected there was no evidence of that and the court commented, "I don't
> believe there was, why don't you continue."
>
> The prosecutor again referred to Lopes-Arteaga's story that someone else
> had a gun and her contact with Bedford.   He continued, "Maryanne Bedford had
> contact with George Munoz the night of the shooting.   They're all talking to each
> other, so then 30 days later [Trillo] is caught.   They take photographs of him,
> photographs of his tattoos, really.   Also, making photographs of any marks, but it
> is not like we have a story here regarding what the defense is going to be.   So-
> "[Trillo] interrupted, objecting that it was improper argument.
>
> Outside the presence of the jury [Trillo] objected to the argument that
> [Trillo] had changed his story.   The prosecutor did it obliquely by reference to
> other witnesses, "[b]ut the way he made it sound and viewed in context what he's

---

[46] 28 U.S.C. § 2254(d).

[47] *See Alberni*, 458 F.3d at 866-67.

telling the jury is that Mr. Trillo has made up different stories to account for his conduct and to create a defense of some kind.  The true facts are, your Honor, is that that's absolutely untrue.  From the very beginning, Mr. Trillo has told everybody that he acted in self-defense, including his father who was not allowed to testify to that . . . .  He told several witnesses in South Carolina he acted in self-defense."

[Trillo] moved for a mistrial or to reopen the evidence to show [Trillo] maintained all along the shooting was in self-defense.  [Trillo] also objected that the argument was an impermissible comment on his right to remain silent.  The prosecutor argued he was simply commenting on the inconsistencies of the witnesses and their credibility.  The trial court took the matter under submission until the next day.

The next day [Trillo] again argued the prosecutor was suggesting that the changes in his friends' stories were attributable to him.  He asserted there was evidence he initially told the police the shooting was self-defense.  He claimed the prosecutor committed error under *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] by commenting on [Trillo's] pretrial silence, an argument abandoned on appeal.  The prosecutor responded that his argument was stopped in mid-sentence and he was going to argue that none of [Trillo's] friends initially mentioned a stab wound.  The court found no *Doyle* error and denied the motion for a mistrial or to reopen the evidence.  The prosecutor continued his rebuttal by noting that he had been beating into the ground that Bedford and Lopes were liars and then moved on to a new subject.  The alleged misconduct was raised again in a motion for a new trial, which was denied.[48]

In rejecting Trillo's arguments, the California Court of Appeal held:

It is improper for the prosecutor to knowingly argue false facts to the jury. (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1104-1105; *People v. Varona* (1983) 143 Cal.App.3d 566, 570.)  The prosecutor committed misconduct in arguing that [Trillo's] first story was that he was not the shooter.  The trial court, however, agreed with [Trillo] there was no evidence to support this argument and so informed the jury.  This timely correction cured the error.

"Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial.  [Citation.]  Whether the inferences the prosecutor draws are reasonable is for the jury to decide.  [Citation.]  Harsh and vivid attacks on the credibility of opposing witnesses are permitted, and counsel can argue from evidence that a witness's testimony is unsound, unbelievable, or even a patent lie. [Citation.]"  (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

It was fair argument to argue [Trillo's] friends got together and changed their stories to support a theory of self-defense.  It was also fair argument to

---

[48] Trillo, 2007 WL 2943242 at *10.

suggest that [Trillo] fabricated that he was attacked to bolster his claim of self-defense.  None of his friends mentioned the supposed attack in their first statements to the police, in sharp contrast to the story at trial.  There was no misconduct in this portion of the prosecutor's closing argument.[49]

Trillo asserts as a second basis for his prosecutorial misconduct claim that the prosecutor improperly warned of the unfavorable reaction of neighbors to a failure to convict.  As described by the California Court of Appeal, the factual basis underlying this contention is:

> At the end of the prosecutor's rebuttal he argued the evidence supported a murder conviction and argued against an acquittal.  "But gosh, we got the instructions about reasonable doubt, and we walked him.  Your neighbor's going to be, you did what?  And you're going to be very uncomfortable."  [Trillo] objected this was improper argument and asked for an admonition.  The court noted the objection and told the prosecutor to continue and "Please relate to the evidence."
>
> The prosecutor continued, "[And][t]he reason you'd be uncomfortable is because not reasonable for you of the evidence [sic] and couldn't explain it and make it reasonable if you tried.  I'm not asking you to do what's popular.  We don't want you to do what's popular.  We want you to do what's right under the law."  The prosecutor asked for a verdict of guilty of murder.[50]

The California Court of Appeal also rejected this contention, holding:

> [. . . .]  Viewing the prosecutor's comments in the context of the argument as a whole (*People v. Lucas* (1995) 12 Cal.4th 415, 475), we believe the jury would have understood the argument to be that they should convict because it was not reasonable under the evidence to acquit.  Because there was no reasonable likelihood the jury misapplied the prosecutor's comments to let their neighbors' reactions influence the verdict, there was no misconduct.  (*People v. Sanders, supra,* 11 Cal.4th at p. 526.)[51]

---

[49] *Trillo*, 2004 WL 2943242 at *11.

[50] *Trillo*, 2004 WL 2943242 at *11.

[51] *Trillo*, 2004 WL 2943242 at *11.

"To warrant habeas relief, prosecutorial misconduct must 'so infect the trial with unfairness as to make the resulting conviction a denial of due process.'"[52]

> In determining whether a comment rendered a trial constitutionally unfair, factors [the court] may consider are whether the comment misstated the evidence, whether the judge admonished the jury to disregard the comment, whether the comment was invited by defense counsel in its summation, whether defense counsel had an adequate opportunity to rebut the comment, the prominence of the comment in the context of the entire trial and the weight of the evidence.[53]

In essence, what is required is that reviewing courts consider what is the equivalent to evaluating whether there was a "reasonable probability" of a different result.[54]

In deciding this case, this Court is guided by several principles.  "Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom."[55] "But, while [the government] may strike hard blows, [it] is not at liberty to strike foul ones."[56] Because it is reasonable to infer where there are two conflicting stories that one of the two sides is being untruthful, it is not improper for the prosecutor to argue why one should be believed and the other disbelieved.[57]  "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy

---

[52] *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

[53] *Hein v. Sullivan*, 601 F.3d 897, 912-13 (9th Cir. 2010); *see Darden*, 477 U.S. at 182.

[54] *See Hein* at 914-15; *see also Fry*, 551 U.S. at 121 (adopting the substantial and injurious effect or influence in determining the outcome standard set forth in *Brecht*, 507 U.S. at 637-38).

[55] *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996).

[56] *Berger v. United States*, 295 U.S. 78, 88 (1935).

[57] *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).

exhortation, will draw that meaning from the plethora of less damaging interpretations."[58]  It is permissible for a prosecutor to argue that a particular witness is believable or not worthy of belief by referring to evidence in the case.[59]

Applying the foregoing principles to the record before it, this Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[60]  Nor can this Court find that the state court unreasonably applied the correct legal principle to the facts of Trillo's case within the scope of *Andrade-Williams-Schriro*; *i.e.*, the state court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable.[61]  Trillo is not entitled to relief under his third ground.

Ground 4:  *Juror Bias/Misconduct*

Ground 5:  *Ineffective Assistance of Trial Counsel – Failure to Pursue Issue of Juror Bias*

Because they are inextricably intertwined, i.e., the outcome on the fifth ground is dependent upon the outcome on Trillo's fourth ground, the Court will discuss the two grounds together.  In his fourth ground, Trillo contends that, because of juror misconduct, he was denied a trial before an impartial jury in violation of his Sixth Amendment rights.  Specifically, Trillo

---

[58] *Donnelly*, 416 U.S. at 647.

[59] *See United States v. Perez*, 144 F.3d 204 (2d Cir. 1998).

[60] 28 U.S.C. § 2254(d).

[61] *See Alberni*, 458 F.3d at 866-67.

contends that two jurors were overheard discussing the case, during which one of the jurors reputedly commented that the case was gang-related, Trillo was obviously guilty, and the juror was glad that Trillo did not get any deal from the D.A. for anything less than murder.  In his fifth ground, Trillo contends that, because his trial counsel failed to pursue the issue of juror misconduct, he was denied the effective assistance of counsel.

Prior to the time a witness, Margo Corona, resumed the witness stand, the following occurred:[62]

> MR. MILLARD:  I think the big thing is that Miss Corona apparently had heard some juror that was talking about the case, or she told Mr. Durenberger that she had.  It's 9:45.  I'd rather take up that when the jury is waiting.  I think that is one of the reasons we had them come back at 9:30, to find out what she says she heard.
>
> THE COURT:  Why don't we take that up at a later point in time?
>
> MR. MILLARD:  Thank you, your honor.
>
> THE COURT:  As the case goes along, I'm in agreement with counsel, I like to keep it moving as efficiently as possible.  If there are matters that need to be taken up, matters we discuss at side bar, I'm making efforts to flag those, but I'll ask counsel also flag those issues that you feel need to be put on the record.
>
> MR. MILLARD:  Thank you.
>
> THE COURT:  You need to tell me that, because we all know when cases go along and we're in the heat of battle, sometimes we're not thinking about these matters.
>
> MR. MILLARD:  Yes, your Honor, absolutely true.
>
> THE COURT:  Okay.  That appears to be major evidentiary hearing as it concerns Margo Corona.
>
> We can take up the other issues at a later point in time.  We can ask the jurors to return to the courtroom.[63]

---

[62] Mr. Millard was Trillo's trial counsel, Mr. Durenberger, the prosecutor.

[63] Reporter's Transcript on Appeal, Vol. II, pp. 565-66.

The jurors returned to the courtroom, and Ms. Corona resumed the stand.  After Ms. Corona completed her testimony and was excused subject to recall, the following occurred outside the presence of the jury:

> MR. MILLARD:  Your Honor, I have one matter I would like to take up, if this is a good time.
> THE COURT:  We're outside the presence of the jury.
> MR. MILLARD:  Yes, your Honor.  That involves --
> MR. DURENBERGER:  I should stop Miss Corona.
> She's gone.  I missed her.
> MR. MILLARD:  Your Honor, the matter I wanted to take up was kind of a technical matter, but it involves how exhibits get written on.[64]

Neither party has identified anything else in the trial record concerning this issue. Following his conviction, Trillo asked the court to substitute new counsel.  During the ensuing *Marsden* hearing,[65] one of Trillo's complaints was that the court never heard from Miss Corona regarding what she heard the jurors saying in the hallway.

The issues of juror misconduct and the failure of Trillo's trial counsel to pursue it were again raised in Trillo's petition for habeas relief based upon his ineffective assistance of counsel before the Sacramento County Superior Court.  The Sacramento County Superior Court held an evidentiary hearing on August 10, 2007,[66] and denied Trillo's petition in a reasoned decision on

---

[64] Reporter's Transcript on Appeal, Vol. III, p. 645.

[65] The term "*Marsden* hearing" is a shorthand reference to *People v. Marsden,* 465 P.2d 44, 47-48 (Cal. 1970), a California Supreme Court case that held that, as part of a criminal defendant's right to effective assistance of counsel under the Sixth Amendment, a trial judge must permit a defendant requesting substitute counsel the opportunity to present his reasons for the request, *i.e.*, evidence and argument to establish that he is receiving ineffective assistance of counsel.

[66] At the hearing, the Sacramento County Superior Court heard the testimony of Teresa Trillo (Trillo's mother), Joe Rojas (Trillo's step-father), Mark Millard (Trillo's trial counsel), Margo Corona, Harold Hamilton (an expert in the practice of criminal law), and Paul Durenberger (the prosecutor at Trillo's trial).

May 5, 2008.  Because it encompasses both grounds, in the interests of brevity, this Court will

address the reasoned decision of the Sacramento County Superior Court denying Trillo's petition

for habeas relief.  In denying Trillo's petition, the Sacramento County Superior Court held:

> [Trillo], an inmate at High Desert State Prison, challenged his conviction
> in this court in 2001 on grounds that he was denied an impartial jury.  [Trillo] also
> argued that he received ineffective assistance of counsel because counsel failed to
> pursue a claim regarding potential misconduct by the jury.  [Trillo] presented
> declarations from his parents stating that while attending trial, they overheard
> jurors describing the case as a gang case, speculating that [Trillo] was guilty and
> proposing that the case would be over quickly.  The court issued an order to show
> cause as to whether [Trillo] received ineffective assistance because counsel failed
> to pursue an issue regarding juror discussion of [Trillo's] gang membership.
>
> After receiving the return and denial, the court ordered an evidentiary
> hearing to address (1) whether anyone overheard jurors discussing the case prior
> to the time that the case was submitted to the jury and (2) whether this
> information was relayed to counsel.  Having considered the testimony at the
> evidentiary hearing, the court HEREBY DENIES the petition.
>
> In evaluating ineffective assistance of trial court counsel, "a defendant
> must first show counsel's performance was 'deficient' because 'his representation
> fell below an objective standard of reasonableness . . . under prevailing
> professional norms.'"  (*In re Harris* (1993) 5 Cal.4th 813, 832-833, citing
> *Strickland v. Washington* (1984) 466 U.S. 668 and *People v. Pope* (1979) 23
> Cal.3d 412; see *also In re Scott* (2003) 29 Cal.4th 783, 811-812.)
>
> In applying the first part of the test, courts are directed to be highly
> deferential.  A petitioner claiming ineffective assistance of counsel must
> overcome a presumption that, considering all of the circumstances, counsel's
> actions "might be considered sound trial strategy."  (*Strickland, supra,* 466 U.S. at
> p. 689.)
>
> In the second part of the test, a petitioner "must also show prejudice
> flowing from counsel's performance or lack thereof.  [cites omitted]  Prejudice is
> shown when there is a 'reasonable probability that, but for counsel's
> unprofessional errors, the result would have been different.  A reasonable
> probability is a probability sufficient to undermine confidence in the outcome.'
> [cites omitted]"  (*Ibid.*)
>
> Finally, courts are advised that it is frequently easier to resolve an
> ineffective assistance claim by looking first at the issue of prejudice; if none is
> established, then it will be unnecessary to consider counsel's performance.  (*In re
> Fields* (1990) 51 Cal.3d 444, 447.)
>
> An ineffective assistance claim against appellate counsel is also subject to
> the same prejudice analysis.  Appellate counsel has a duty to "argue all issues that
> are arguable."  (*People v. Feggans* (1967) 67 Cal.2d 444, 447.)  An arguable issue

is one that has sufficient merit and import that it potentially could result in reversal.  (See *In re Harris* (1993) 5 Cal. 4th 813, 833.)

The question of juror misconduct may be raised on habeas and does not have to be couched in ineffective terms.  (See, e.g., *In re Hutchings* (1993) 6 Cal.4th 97.)  Penal Code § 1222 provides that jurors must not converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them."

At the evidentiary hearing, [Trillo's] mother, Teresa Trillo, and his step-father, Joe Rojas, testified about remarks they heard other persons in a court hallway make one day when they attended [Trillo's] trial.  Both reported having heard a person they later identified as a juror discussing how quickly the case would be over because it was a gang case.  After additional questioning, Ms. Trillo also recalled that she heard the person say that [Trillo] was guilty.  She recalled having told [Trillo's] attorney about what she had heard.  Ms. Trillo further testified that she talked with her son by phone while the trial was progressing and after the verdict.  She said she told him about what she had overheard in the hallway but did not know exactly when she talked to him about this.

A *Marsden* motion heard during trial raises questions about the recollections of [Trillo's] parents.  At the *Marsden* hearing, petitioner questioned why his attorney had failed to pursue a question of juror misconduct.  [Trillo] was aware of the incident because it had been reported that a witness, Margo Corona, overheard jurors discussing the case as a gang case.  Counsel explained that he thought the case was going well and did not want to antagonize jurors by questioning their integrity.  In ruling on the *Marsden* motion, the court concluded that counsel acted within the appropriate range in making tactical decisions regarding [Trillo's] representation.

Details indicate that the conversation overheard by [Trillo's] parents was the same one that Ms. Corona had overheard.  At the time of the *Marsden* motion, [Trillo] said nothing about his parents' having overheard the jurors.  He said nothing about his parents' having told his counsel about what they had heard.  These are significant omissions and ones that make it difficult for the court to conclude that [Trillo] and his parents were correct in describing what was overheard and reported to counsel.  Even if [Trillo's] mother did not immediately tell [Trillo] about the conversation in the hallway, there is no explanation for why he would not have raised this question when she did report it to him.  The *Marsden* hearing show's that [Trillo] considered this a significant issue.

Mark Millard, [Trillo's] attorney, had difficulty recalling some of the details of the trial.  What he did not recall is significant in itself.  Mr. Millard did not recall Ms. Trillo telling him that she overheard jurors discussing how long the case would be, that the case would not last long, that the case was a gang-related murder, that [Trillo] was obviously guilty or that the jurors were glad [Trillo] had not gotten a plea deal.  These are the sort of details that would stand out in an attorney's mind even several years after a case had concluded.  The fact that Mr.

Millard had no such memories also leads the court to question whether [Trillo's] parents have correctly recalled the events on the day of their court visit.

Paul Durenberger, the prosecutor, testified to a somewhat different version of the events. According to Mr. Durenberger, he received a report from Ms. Corona that people were talking about the case in the hallway. Because he was concerned that those people might be jurors, he alerted Mr. Millard to the problem, and Mr.Millard brought it to the court's attention.

Later in the same day, however, Mr. Durenberger testified, Ms. Corona informed him that she had determined that no jurors were involved in the conversation she overheard. Ms. Corona herself testified that she overheard persons from her neighborhood talking about the case. She thought she had told the prosecutor from the outset that the persons she overheard were not jurors. In either case, however, the fact that no jurors were talking about the case would explain why counsel never pursued the matter more than they initially did.

In summary, the court finds that the testimony of [Trillo's] parents was not credible as to the identity of persons they may have overheard talking in a court hallway. The testimony of the prosecutor was credible in explaining why he first reported that jurors might have been involved in a hall conversation but then did not pursue the matter upon learning that the persons overheard in the hall were not jurors.

[Trillo] has failed to show that juror misconduct occurred. He has also failed to show that counsel's conduct fell below an objective standard of reasonableness under prevailing professional norms. (*Harris, supra.*) The petition must be denied.[67]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Trillo must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[68] A deficient performance is one in which counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.[69] Trillo must show that his defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's

---

[67] Lodged Doc. 3, pp.1-6.

[68] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[69] *Id.*

ineffectiveness, the result would have been different.[70]  An analysis that focuses "solely on mere

outcome determination, without attention to whether the result of the proceeding was

fundamentally unfair or unreliable, is defective."[71]

> In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:
>
> > The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  *Schriro, supra,* at 473, 127 S. Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[72]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims

under the § 2254(d)(1) standard.[73]

With respect to Trillo's ineffective assistance of counsel claim, the Sacramento County

Superior Court applied the test mandated by the Supreme Court.  Thus, this Court cannot say that

decision was contrary to or involved an unreasonable application of clearly established Federal

---

[70] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

[71] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmel v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); *United States v. Cronic*, 466 U.S. 648, 258 (1984) ("the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.").

[72] *Knowles v. Mirzayance*, 556 U.S. ___, 129 S. Ct. 1411, 1420 (2009).

[73] *See id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

law as determined by the Supreme Court.  Whether the decision was an unreasonable

determination of the facts in light of the evidence presented to the state court is dependent upon

whether there was juror misconduct.

With respect to his claim of juror misconduct, the Sacramento County Superior Court

found that Trillo did not prove his claim.  The findings of fact by the Sacramento County

Superior Court are presumed to be correct unless Trillo rebuts this presumption by clear and

convincing evidence.[74]  Trillo has not provided any additional evidence to this court.  Indeed,

Trillo's argument is essentially that the state courts should have believed his parents.  Assuming,

without deciding, that the sufficiency of the evidence standard in *Jackson v. Virginia,* "after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt,"[75] applies to this

case, Trillo does not prevail.  Under *Jackson,* the role of this Court is to simply determine

whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain the

conclusion reached.[76]  This Court is precluded from either re-weighing the evidence or assessing

the credibility of witnesses.  Where, as in this case, the question is one of credibility, the finding

of the trier of fact carries the day.[77]

This Court cannot say that the decision of the Sacramento County Superior Court was

"contrary to, or involved an unreasonable application of, clearly established Federal law, as

---

[74] 28 U.S.C. § 2254(e)(1); *Miller-El*, 537 U.S. at 340.

[75] 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. ___, 130 S. Ct. 665, 673 (2010) (reaffirming this standard).

[76] *See Schlup v. Delo*, 513 U.S. 298, 340 (1995).

[77] *See Bruce v Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[78] Nor, viewing the matter through the doubly-deferential lens of *Mirzayance*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of Trillo's case within the scope of *Andrade-Williams-Schriro*; i.e., the state-court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable. Trillo has failed to establish that counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that his defense was prejudiced, as required by *Strickland-Hill*.  In particular, in light of the finding that there was no juror misconduct, Trillo has failed to show prejudice.

Ground 6:  *Ineffective Assistance of Trial Counsel – Failure to Object to Prosecutorial Misconduct in Closing Argument*

Because, as discussed in connection with the second ground, there was no prosecutorial misconduct, therefore no prejudice, Trillo's trial counsel was not ineffective for failing to object.[79]  Trillo is not entitled to relief under his sixth ground.

## V. CONCLUSION AND ORDER

Trillo is not entitled to relief on any ground raised in his Petition.

---

[78] 28 U.S.C. § 2254(d).

[79] *Strickland*, 466 U.S. at 487; *Hill*, 474 U.S. at 57; *see Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) (holding that appellate counsel does not have an obligation to raise every nonfrivolous argument); *Miller v. Keeney*, 882 F.2d 1428, 1428 (9th Cir. 1989) (holding that appellate counsel's failure to raise a weak issue did not constitute ineffective counsel).

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[80]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[81]

The Clerk of the Court is to enter judgment accordingly.

Dated:  January 28, 2011.

   /s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[80] 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (a COA should be granted where the applicant has made "a substantial showing of the denial of a constitutional right," *i.e.,* when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks omitted).

[81] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.